**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**KANSAS CITY DIVISION**

| | | |
|---|---|---|
| STRANGE MUSIC, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| | ) | |
| STRAINGE ENTERTAINMENT, LLC | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Strange Music, Inc. ("Strange Music"), by and through its undersigned counsel, for its Complaint against Strainge Entertainment, LLC ("Strainge Entertainment") alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for trademark infringement and related claims arising out of Strainge Entertainment's use of STRAINGE and variations thereof (*e.g.*, STRAINGE ENTERTAINMENT and STRAINGE MUSIC) in the music industry (collectively, "the STRAINGE Marks")—all in violation of Strange Music's statutory and common law rights in its extensive and valuable portfolio of well-known STRANGE and STRANGE MUSIC trade names, trademarks, and service marks (collectively, the "STRANGE Marks").

2.      Strange Music and Strainge Entertainment are both in the business of developing, marketing, and promoting recording artists as independent urban record labels in identical music genres.   As set forth below, Strainge Entertainment violated Strange Music's intellectual property rights by unlawfully adopting the STRAINGE Marks, which are confusingly similar to

- 1 -

the STRANGE Marks as used in connection with identical goods and services in the music industry.

3.     On information and belief, Strainge Entertainment knew about the STRANGE Marks, which Strange Music has used openly and notoriously for well over a decade to protect its famous brand.  Strainge Entertainment adopted the STRAINGE marks egregiously, willfully, and intentionally to try to capitalize on Strange Music's notoriety, goodwill, and reputation in the music industry.

4.     Consumers are already confused, and are likely to continue to be confused, between the STRANGE Marks and the STRAINGE Marks.

5.     Strange Music therefore seeks a preliminary and permanent injunction restraining Strainge Entertainment's unlawful conduct in infringing the STRANGE Marks, Strainge Entertainment's profits flowing from its infringing activities, Strange Music's actual damages, treble damages, costs, and attorneys' fees.

## THE PARTIES

6.     Strange Music is a Missouri corporation with its principal place of business at 1250 NE Sloan Street, Lee's Summit, Missouri 64086.  Strange Music owns the STRANGE Marks and attendant goodwill, and has marketed various goods and services under the STRANGE Marks in this state and judicial district, as well as nationwide and internationally.

7.     On information and belief, defendant Strainge Entertainment is a California limited liability company with its principal place of business at 9255 Doheny Road #2402, West Hollywood, California 90069.  Exhibit A is a true and accurate copy of the home page of its website, www.strainge.com.   (Ex. A.)   It states that Strainge Entertainment "find[s] and develop[s] recording artists and songwriters.  With a team and network of people that have

- 2 -

endless resources, our unique group is able to aid artist [sic] elevate their music, branding, and marketing." (*Id.*)

8.     Strainge Entertainment's registered agent for service of process is LegalZoom.com, Inc., located at 101 N. Brand Blvd. 11th Floor, Glendale, CA 91203.

## JURISDICTION AND VENUE

9.     This action arises under the Lanham Act 15 U.S.C. § 1051 *et seq.* and the statutory and common law of the state of Missouri.  This Court has jurisdiction over all claims under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the matter in controversy exceeds the sum or value of $75,000.  This Court also has jurisdiction over the Lanham Act claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338.  This Court also has supplemental jurisdiction over the Missouri statutory and common law claims pursuant to 28 U.S.C. § 1367 in that they are so related to the federal claims that the state law and common law claims form part of the same case or controversy and derive from a common nucleus of operative facts.

10.     This Court has personal jurisdiction over Strainge Entertainment.  The exercise of jurisdiction is proper under the Missouri Long Arm Statute at least because Strainge Entertainment committed tortious acts within the state; its infringing products are available for sale and have been purchased in Missouri, and its infringement of the STRANGE Marks has caused economic injury to Strange Music at its Missouri headquarters; thus, Strainge Entertainment's tortious acts yield consequences in Missouri.  *See* MO. REV. STAT. § 506.500.1(3).  The exercise of jurisdiction comports with due process at least because Strainge Entertainment knew its infringing goods would be sold via interactive online music distribution channels available to Missouri residents and were in fact listened to, downloaded, and sold in Missouri to at least one Missouri resident; Strainge Entertainment knowingly and intentionally

- 3 -

adopted and is using the infringing STRAINGE Marks to steal, hijack, and trade off the goodwill of Strange Music and its STRANGE Marks, which are notorious in the music industry and, in particular, in connection with the hip-hop/rap genre; Strainge Entertainment's actions were therefore uniquely and expressly aimed at the State of Missouri because they were performed for the very purpose of having Strange Music feel the effects in Missouri; and Strainge Entertainment's knowing and intentional misconduct caused harm to Strange Music, the brunt of which was suffered—and which Strainge Entertainment knew was likely to be suffered—in Missouri.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Strainge Entertainment is subject to the Court's personal jurisdiction with respect to this action. In addition, a substantial part of the events or omissions giving rise to this claim occurred in this judicial district—namely, Strainge Entertainment's intentional and tortious actions directed at Strange Music, which is headquartered in Lee's Summit, Missouri.

<u>STRANGE MUSIC ACHIEVED IMMENSE SUCCESS AND NOTORIETY<br>IN THE MUSIC INDUSTRY AS AN INDEPENDENT RECORD LABEL</u>

12.     Strange Music is an independent record label formed in 1999 by celebrated artist and rapper Aaron Dontez Yates a/k/a "Tech N9ne" and Travis O'Guin (or "O'Guin"), an entrepreneur and businessman.  Strange Music is in the business of identifying, developing, recording, producing, and promoting talented artists in the music industry.  It has historically focused on the hip-hop/rap music genre, but it has long enjoyed crossover appeal among rock fans.  In more recent years, it has expanded to pop music.  Its lineup has grown to include more than a dozen artists, and the label has released more than 60 albums netting over twenty million ($20,000,000) in annual revenue in combined record and merchandise sales in recent years.

- 4 -

13.     Tech N9ne was born and raised in a rough area of Kansas City, Missouri, in a churchgoing household led by his single mom. A self-professed fan of The Doors, he turned to rap at an early age, using it to enhance his math and reading skills. By the late 1990s, he was known for his painted face, his wild and colorful hairdos, and his talented booming voice and fast-rhyming, rapid-fire flow.

14.     Tech N9ne joined the group Black Mafia in 1991 at the age of 20, and signed his first record deal in 1993 as a member of the group Nnutthowze. In 1998, he had deals with and commitments to Kansas City independent label MidwestSide Records, Quincy Jones' Qwest Records, and numerous others.

15.     In 1999, Tech N9ne met fellow Kansas City native O'Guin, who had grown up the youngest son of a sod farmer in a 900-square-foot home with four siblings. By age 22, O'Guin was an entrepreneur and self-made millionaire. The two became friends. Tech N9ne was tired of being given the runaround in the music business, having been passed around from record label to record label. O'Guin saw that Tech N9ne was being mismanaged by a series of individuals and confusing deals. But O'Guin recognized that Tech N9ne had overwhelming talent that would eventually blow up.

16.     The two founded Strange Music, with O'Guin serving as CEO and Tech N9ne as its VP and flagship artist. Strange Music arose out of a quest to develop an independent record label that defied the normal business model in the music industry.

17.     In the early years, the label struggled with distribution. But Tech N9ne's first two albums on the Strange Music label eventually sold 500,000 albums and Tech N9ne gained traction with his fan base. By 2006, Strange Music had built sufficient goodwill and credibility among fans and the music industry to secure a distribution deal with Fontana, which was at the

- 5 -

time a distribution arm of Universal Music Group and is now wholly owned by INgrooves. The deal paved the way to give Strange Music freedom to produce the kind of music it wanted to make, while providing needed distribution resources and channels.

18.     Tech N9ne became a prolific artist, releasing on average one album on the Strange Music label per year. In 2011, his Strange Music album *All 6's & 7's* landed at #4 on the Billboard 200 chart and #1 on the Rap Album, R&B/Hip-Hop Albums, and Independent Albums charts. In 2012, his Strange Music album *Klusterfuk* hit #1 on the Billboard Independent chart before Strange Music spent a single dollar on marketing. His 2013 Strange Music album *Something Else* debuted at #4 on the Billboard 200 chart. Strange Music released his album *Special Effects* in 2015, which also debuted at #4 on the Billboard 200. In 2017, he became a platinum-selling artist with the song "Caribou Lou." He also has two gold singles in "Hood Go Crazy" and "Fragile." The debut positions for the *Tech N9ne: Collabos* series of Strange Music albums have steadily risen on the R&B/Hip-Hop Albums chart from 2007's *Misery Loves Kompany* at #23 to 2014's *Strangeulation* at #1.

19.     Tech N9ne is renowned for his live performances and tour schedule, having performed over 1,000 shows from 2008-2013. He averaged about 200 shows a year for five years straight and continues to play more than 100 shows a year. Fans attending a Strange Music performance know they can expect a one-of-a-kind show with live rapping, crazy stage props, and full-blown entertainment.

20.     Today, Strange Music, its founders Tech N9ne and O'Guin, and other Strange Music artists such as Krizz Kaliko and Rittz, are well known in the hip-hop/rap music industry. Both Tech N9ne and O'Guin have been featured in *Forbes*. Tech N9ne debuted on the *Forbes* Hip-Hop Cash Kings list in 2012 alongside Dr. Dre, Jay-Z, Kanye West, and Nicki Minaj, and he

- 6 -

has regularly appeared on the list since. In 2013, *Forbes* dubbed him a hip-hop "Mogul." A 2016 *Forbes* article focusing on Strange Music artists Rittz and Krizz Kaliko remarked that "Strange Music has not only survived, but thrived during a perilous time for the music business."

21.     *HipHopDX* observed that "[i]t's no secret that Kansas City rap titan Tech N9ne is an independent music kingpin, one who has tirelessly built his Strange Music Inc. imprint from the ground up and done it in a way that protects the integrity of the music he wants to make."

22.     Similarly, *Greenlabel* recognized that "[w]ith almost two decades in business, Strange Music has revolutionized the independent hip-hop business model on the strengths of rigorous touring and income generated through merchandising."

23.     The heart of Strange Music is its loyal and dedicated fans. Indeed, Tech N9ne is known for his deep connection with fans, which is virtually unparalleled in the world of entertainment. Strange Music's artists try to engage with fans in ways the artists themselves would have liked. For example, Strange Music's concerts typically showcase multiple artists who engage in hour-long meet-and-greets with hundreds of fans. Strange Music has a YouTube channel with over 1,000,000 subscribers, and Strange Music and its artists have over 1,000,000 Twitter followers. Fans proudly wear Strange Music's merchandise—ranging from apparel (*e.g.*, shirts, jerseys, hoodies, and hats), to pendants, jewelry pieces, and other accessories (*e.g.*, lanyards, wrist bands, bandanas, belts, shoe laces, car mats). Thousands of fans have emblazoned the Strange Music logo on their bodies with tattoos:



24.     Today, Strange Music is a multi-million dollar business with interests in music, merchandising, satellite radio, and film and video production, among other things.   It is headquartered in an 18,000 square foot building in Lee's Summit, Missouri.  The headquarters building is part of a complex that also includes Strange Land Studios, a 27,000 square foot building that is home to two recording studios and video editing operations.  The complex also includes Strange World Merchandise, a massive warehouse that houses Strange Music's diverse merchandise lineup.  The Strange Music name and logo are everywhere.

## THE STRANGE MARKS

25.     As Strange Music built its brand, it developed extensive and valuable goodwill in its trade name and its portfolio of protected, valuable trademarks and service marks.   This includes several federally registered trademarks and variations thereof used in connection with a variety of products and services, most notably its famous independent record label.

26.     Since Strange Music's founding in 2000, it has used STRANGE MUSIC as a common law trade name, trademark, and service mark.  It has widely used and highly promoted the STRANGE MUSIC mark in commerce throughout the United States in connection with a

variety of products and services such as its famous independent record label, live performances, promotional materials (*e.g.*, apparel, accessories, etc.), and online in various social media platforms. In more recent years, Strange Music has used STRANGE LAND as a common law trademark and service mark in connection with recording studio goods, services, and apparel.

27. Strange Music's STRANGE MUSIC trademark and service mark are federally registered with the United States Patent & Trademark Office via U.S. Registration No. 3,902,834 in Class 9 for "Audio tapes featuring music; Compact discs featuring music; Digital music downloadable from the Internet; Downloadable musical sound recordings; Downloadable video recordings featuring music; Musical sound recordings; Musical video recordings"; in Class 25 for "Gloves as clothing; Hats; Headbands for clothing; Jackets; Jerseys; Leather belts; Pants; Short-sleeved or long-sleeved t-shirts; Sports jerseys; T-shirts; Ties; Tops; Underwear; Wearable garments and clothing, namely, shirts"; and in Class 41 for "Entertainment services in the nature of live musical performances; Entertainment, namely, live performances by musical bands." (Ex. B.)

28. Strange Music's STRANGE MUSIC trademark is also federally registered with the United States Patent & Trademark Office via U.S. Registration No. 4,016,487 in Class 14 for "Body jewelry; charms; jewelry; jewelry chains; jewelry and imitation jewelry." (Ex. C.)

29. Strange Music's STRANGE LAND trademark and service mark is federally registered with the United States Patent & Trademark Office via U.S. Registration No. 5,281,911 in Class 25 for "shirts" and in Class 41 for "Recording studio services, Sound recording studios." (Ex. D.)

30. Strange Music's iconic logo is a combination of a snake and bat wings that form the letters "SM":



It is federally registered as a trademark and service mark with the United States Patent & Trademark Office via U.S. Registration Nos. 3,721,951, 3,821,661, 3,935,008 in several different classes of goods and services.  (Ex. E-G.)

31.     Strange Music's federally registered marks are valid, subsisting, and constitute *prima facie* evidence of the validity of the marks, Strange Music's ownership of the marks, and Strange Music's exclusive right to use the marks in commerce on or in connection with the goods and services covered by those registrations.

32.     Strange Music also has other trademark applications pending, including an intent-to-use application for STRANGE WORLD for which the United States Patent & Trademark Office has already granted Strange Music a notice of allowance.

33.     These marks are collectively referred to as the "STRANGE Marks."

34.     Strange Music has and continues to operate nationwide under the STRANGE Marks to identify its artists, music, tours, and merchandise, and to promote its brand such as on album covers, merchandise, online and in social media, among other things.  Representative

copies of some of these materials are attached as Exhibit H. Strange Music has developed extensive and valuable goodwill in its proprietary STRANGE Marks, which consumers have come to recognize as an identifier and symbol of the Strange Music brand, including its wide variety of products and services.

35.     Strange Music is the owner of broad common law and federal trademark rights in the STRANGE Marks.

### STRAINGE ENTERTAINMENT EGREGIOUSLY, WILLFULLY, AND INTENTIONALLY TRIED TO STEAL STRANGE MUSIC'S VALUABLE GOODWILL IN THE STRANGE MARKS

36.     Caroline Records and Music ("Caroline") holds itself out as "a full service partner to the independent label and artist community." Caroline is owned by Capitol Music Group which is, in turn, owned by Universal Music Group.

37.     On several occasions throughout the years, Caroline made overtures trying to get Strange Music to join the Caroline label. But Strange Music was not interested.

38.     In 2016, 22-year-old Elliot Grainge formed Strainge Entertainment, which is partnered with Caroline and Universal Music Group. (Ex. A.) Grainge is the son of Universal Music Group Chairman and CEO Lucian Grainge, who topped *Billboard Magazine*'s "Power 100" list as the most powerful person in the music business in 2013, 2015, and 2016.

39.     Since Strainge Entertainment's founding in 2016, it has signed hip-hop/rap artists Trippie Redd, Reo Cragun, and Third World Don, as well as social media star Kristen Hancher who (among other things) lip syncs to hip-hop/rap music.

40.     The label just began producing albums in 2017, including Trippie Redd's *A Love Letter to You*, *Chair Falling*, *Bust Down* and *In Too Deep*; Reo Cragun's *Night Crawler*, *Growing Pains*, *It's Over* and *Lost*; and Third World Don's *Ray Charles*.

- 11 -

41.     Strainge Entertainment's music is often marketed, exploited and/or sold through the same channels as Strange Music's music, such as iTunes, Spotify, and Amazon Music.  For example, Reo Cragun's *Growing Pains* album is available through at least Amazon, iTunes, Google Play, Napster, Rhapsody, Spotify, Tidal, and Soundcloud.  (Ex. I.)

42.     Strainge Entertainment promotes and advertises its brand and artists through its website and various social media platforms.  In doing so, it employs multiple variations of the word "strainge" to confuse and deceive consumers, including "www.strainge.com," "THIS IS STRAINGE," and "Strainge," as well as "Strainge Music," "@straingemusic," and "@straingevision."

43.     For example, Strainge Entertainment's website prominently states that "THIS IS STRAINGE" and its URL is www.strainge.com.  (Ex. A.)

44.     Strainge Entertainment's YouTube page[1] uses the name "Strainge Music."  (Ex. J.)  That same page lists links to various social media pages, all of which use "straingemusic" in their URLs.  (*Id.*)

45.     Strainge Entertainment's Twitter page[2] uses the name "Strainge" and the handle "@straingevision."  (Ex. K.)

46.     Strainge Entertainment's Facebook page uses the name "Strainge" and the handle "@straingemusic."  (Ex. L.)

47.     Elliot Grainge also uses the term "Strainge" and promotes his business in his own social media accounts, including by linking to music by Strainge Entertainment artists.  For example, his Facebook page[3] touts him as the founder of Strainge Entertainment and links to Strainge Entertainment's website.  (Ex. M.)  His Twitter handle is "@estrainge" and his Twitter

---

[1] https://www.youtube.com/channel/UC7rYLWO0aWY5tmrVSukse8A.
[2] https://twitter.com/straingevision.
[3] https://www.facebook.com/Elliot-Grainge-789919964507239/.

- 12 -

page[4] promotes Strainge Entertaintment's artists.  (Ex. N.)  His Instagram page[5] uses the term "Strainge." (Ex. O.)

48.     These pages have led consumers to mistakenly associate him with Strange Music. For instance, user "brpimp102pimpintube" included the handle "@strangemusicinc" in his response to a September 5, 2017, post by Mr. Grainge.  (Ex. P.)  But the handle "@strangemusicinc" belongs to Strange Music.

49.     Strainge Entertainment's unauthorized use of the STRAINGE Marks has caused actual confusion among the relevant consumers.

50.     On January 10, 2016, Twitter user "Daniel Walker (Rap)" retweeted a post from Strange Music regarding Tech N9ne's *Special Effects*, and also tweeted "I need to get sighned [sic]" using the hashtags "#@TechN9ne #Straingemusic." (Ex. Q.)

51.     On September 8, 2017, Facebook user "Jessi Plantillas" created a post linking to a video from Krizz Kaliko, a Strange Music artist, while also using the hashtag "#StraingeMusic." (Ex. R.)

52.     Instagram user "upnextartistz" created a post with a picture of Strainge Entertainment artist Trippie Redd that included the Strange Music logo and STRANGE MUSIC mark.  (Ex. S.)

53.     The website www.kanyetothe.com includes a forum titled "Trippie Redd is signed to Strange Music?"  (Ex. T.)  In September 2017 a user with the tag "Columbo" posted the comment in that forum reading "Tech N9ne's Strange Music? Lmao."  (*Id.*)

---

[4] https://twitter.com/estrainge.
[5] https://www.instagram.com/elliot/.

54.     In a September 8, 2017, video that Strainge Entertainment artist Trippie Redd posted to his Facebook account, he proclaimed that "I'm signed to him [Elliot Grainge] and his label is strange music.  You are not signed to strange music."[6]  (Ex. U.)

55.     This message confused fans, who messaged Tech N9ne on Instagram asking "is this guy Trippie Redd part of strange music????????" (Ex. V) and "U signed trippy red trash ass?" (Ex. W.)

56.     On Twitter, user "Bad Brandon" posted on September 13: "Hmm Trippie Redd is signed to Tech 9's label. Makes sense[,]" and later posted "Strange Music about to make a lot of money lol."  (Ex. X.)

57.     Others directed their messages at Trippie Redd.  On September 15, Twitter user "Don Ro Corleone" posted: "@trippieredd bro wtf are you signed to strange?!?"  (Ex. Y.)  On information and belief, Twitter user "Don Ro Corleone" is located in St. Louis, Missouri.  (Ex. Z.)

58.     Strainge Entertainment wrongfully adopted marks confusingly and deceptively similar to the STRANGE Marks, without permission or other authorization from Strange Music. Strange Music notified Strainge Entertainment of its infringement of the STRANGE marks, yet Strainge Entertainment continued its knowing and willful infringement, blatantly disregarding the STRANGE Marks to the detriment of Strange Music.

## STRAINGE ENTERTAINMENT'S USE OF THE STRAINGE MARKS WILL IRREPARABLY HARM STRANGE MUSIC'S GOODWILL

59.     Strainge Entertainment's use of the STRAINGE Marks has already and will continue to damage the substantial and valuable goodwill Strange Music has built over more than

---

[6] Video available athttps://www.facebook.com/ayetrippieredd/videos/417629648639882/.

16 years in the music industry, particularly in the hip-hop/rap genre and as an independent record label.

60.   Strange Music's goodwill stems not only from the talent and relentless work ethic of the company's artists, including their intense touring schedule and rapid album output, but also the company's business model, code of conduct, and strong industry relationships it has deliberately and painstakingly built to create a credible reputation as a reliable source of goods and services in a music genre that is often laden with unreliable artists and labels.

61.   Strange Music generates revenue from three primary sources—music sales, touring, and merchandising.   It and its artists also have a substantial and meaningful online and social media presence.

62.   On the retail side, Strange Music has built its reputation over more than a decade of repeated and consistent delivery of music sales at digital service providers and retailers, including accurately representing sales and consumption estimates.   Based on its consistently excellent business performance, its retail customers have come to expect a major push from the entire label roster combined with a strong consumer-advertising campaign to ensure sell-through.   This has given Strange Music credibility that makes retail customers more willing to bring in Strange Music releases than they might otherwise be with a less credible brand.   Many retail customers (including iTunes and Best Buy) have a "report card" for each of their labels.   Strange Music goes to great lengths to maintain an impeccable record on these "report cards."   Strange Music's goodwill and credibility with retailers will be damaged if and when the confusingly similar Strainge Entertainment fails to live up to these retailers' expectations, as it inevitably will.   This may occur, for example, when it inaccurately represents its sales and consumption estimates and/or fails to promote its albums to ensure sell-through.

63.     Strange Music has also built goodwill through the live performances of its artists, who tour extensively.  At any given time, up to six different collections of Strange Music artists may be touring around the world.  And many of Strange Music's shows feature artists from across its roster.  Tech N9ne's support for these artists on the Strange Music label has created a brand trust like no other.  Due to these tireless efforts, customers take the label at its word when it promotes its artists.

64.     Furthermore, rap artists generally have a poor reputation when touring because many artists do not honor their commitments.  But, based on well over a decade of consistent effort, Strange Music and its affiliated artists have established themselves as the dependable anomaly in the industry.  Strange Music artists are subject to a company rulebook while on tour and can be counted on by promotors to show up punctually, act professionally, perform for the expected set duration, and avoid the drug and violence issues common to the industry—an anomaly so rare in the industry that it drew the attention of *The Wall Street Journal*.  (Ex. AA.)  Strange Music undergoes a careful recruitment and screening process to ensure that all of the artists performing under its brand will positively contribute to its brand and image.  Strange Music's unusually strict tour rules have helped its touring business thrive by securing favorable terms with venues while other rappers often face difficulties.  Typically, Strange Music artist tours are executed flawlessly.  As a result, Strange Music has built a deep well of goodwill both among promoters, who know they can count on Strange Music to do the proper marketing and promotion for every show, as well as the consuming public, who have come to expect consistently excellent performances.  Strainge Entertainment and its artists will almost certainly fail to live up to the impeccable standard Strange Music has set, which will damage Strange Music's reputation.

65. The value of Strange Music's brand is further demonstrated by the substantial revenue it has generated from its branded merchandise sales. In recent years, these sales have eclipsed even Tech N9ne's music sales. As customers are deceived and confused by Strainge Entertainment's use of the STRAINGE Marks, Strange Music will likely see loss in sales and erosion of its market share. Given the nature of the industry, it is inevitable that Strainge Entertainment will sell merchandise with the STRAINGE Marks, further confusing consumers and irreparably damaging Strange Music's goodwill and market share.

66. Strange Music's physical product is distributed through Universal Music. It does not appear that Strainge Entertainment currently distributes physical goods. However, Strainge Entertainment will inevitably do so and, when it does, those goods will go through Strainge Entertainment's partnership deal with Caroline, which means they will be distributed through Universal Music—right alongside Strange Music's goods.

67. Strainge Entertainment's intentional violation of Strange Music's intellectual property rights has already harmed Strange Music, and will continue to irreparably harm Strange Music unless enjoined, both preliminary and permanently.

## COUNT I – FEDERAL TRADEMARK INFRINGEMENT
### (Lanham Act § 32, 15 U.S.C. § 1114)

68. Strange Music realleges and incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

69. By engaging in the acts described above, Strainge Entertainment is using the STRAINGE Marks in connection with goods and services in interstate commerce in ways that are confusingly similar to the STRANGE Marks and thus are likely to cause consumer confusion, or to cause mistake, and to deceive.

- 17 -

70.     As a direct and proximate result of Strainge Entertainment's infringement, it has derived unlawful gains, profited, benefited, and been otherwise unjustly enriched in the marketplace at the expense of and injury to Strange Music.

71.     Strainge Entertainment's actions demonstrate an egregious, intentional, willful, and malicious attempt to trade on the goodwill associated with the STRANGE Marks.

72.     Strainge Entertainment's actions constitute infringement of registered mark(s) in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

73.     Strange Music is being and will continue to be damaged by Strainge Entertainment's infringing actions, which cause a likelihood of confusion and actual confusion among the relevant consuming public as to the true identity, source, sponsorship, or affiliation of good and services.

74.     Because of Strainge Entertainment's infringing activities, Strange Music has suffered and will continue to suffer irreparable harm to its business reputation and goodwill, for which Strange Music has no remedy at law to alleviate.

75.     Strange Music is entitled to preliminary and permanent injunctive relief, an accounting of profits, damages, costs, and attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116, and 1117, and further enhanced and trebled pursuant to 15 U.S.C. § 1117.

### COUNT II – FEDERAL UNFAIR COMPETITION
**(Lanham Act § 43(a), 15 U.S.C. § 1125(a))**

76.     Strange Music realleges and incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

77.     Strainge Entertainment's infringing actions constitute a false designation of origin and/or false description by representing that Strainge Entertainment's goods and services originate from the established brand built by Strange Music, or otherwise suggests that Strange

- 18 -

Music authorizes, endorses, sponsors, or otherwise approves those goods or services, when in fact Strange Music does not. Strainge Entertainment's use of the STRAINGE Marks is without Strange Music's permission or authorization, and Strainge Entertainment is not affiliated with Strange Music or the STRANGE Marks.

78.     Strainge Entertainment knew of this falsity but nevertheless launched, offered, advertised, and sold goods and services in competition with Strange Music by using marks confusingly or deceptively similar to Strange Music's STRANGE Marks.

79.     Strange Music is being and will continue to be damaged by Strainge Entertainment's false designations and representations because they are resulting in and, unless enjoined, will continue to result in confusion among the purchasing public and the trade as to the true affiliation, connection, association, origin, sponsorship, or approval of goods and services and thereby influence purchasing decisions.

80.     Because of Strainge Entertainment's false designations and representations, Strange Music has suffered and will suffer irreparable harm to its business reputation and goodwill, which Strange Music has no adequate remedy at law to alleviate, and the loss of sales and profits that Strange Music would have made but for Strainge Entertainment's actions.

81.     Strainge Entertainment's actions demonstrate an egregious, intentional, willful, and malicious attempt to trade on the goodwill associated with the STRANGE Marks.

82.     Strainge Entertainment's false and deceptive designations and representations violate § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

83.     Strange Music is entitled to preliminary and permanent injunctive relief, an accounting of profits, damages, costs, and attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116, and 1117, and further enhanced and trebled pursuant to 15 U.S.C. § 1117.

- 19 -

## COUNT III – TRADEMARK DILUTION
### (MO. REV. STAT. § 417.061)

84.    Strange Music realleges and incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

85.    The STRANGE Marks are valid and subsisting.

86.    The STRANGE Marks are inherently distinctive or have become distinctive by acquired secondary meaning.

87.    Strainge Entertainment's use of the STRAINGE Marks has created a likelihood of diluting the distinctive quality of the STRANGE Marks.

88.    Strainge Entertainment's actions were committed with knowledge that the STRAINGE Marks are intended to be used to cause confusion or mistake or to deceive.

89.    Strange Music is entitled to an injunction against Strainge Entertainment's continuing dilution of the STRANGE Marks.  Unless enjoined, Strainge Entertainment will continue its diluting conduct.

90.    On information and belief, as a direct and proximate result of Strainge Entertainment's acts, Strainge Entertainment has derived unlawful gains, profited, benefited, and been otherwise unjustly enriched in the marketplace at the expense of and injury to Strange Music.

## COUNT IV – STATE COMMON LAW
## TRADEMARK INFRINGEMENT

91.    Strange Music realleges and incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

92.    Strainge Entertainment's actions constitute common law trademark infringement in violation of the common law of several states, including the State of Missouri.

93.     As a result of Strainge Entertainment's actions, Strange Music has been damaged in an amount not yet determined or ascertainable.  But, at a minimum, Strange Music is entitled to preliminary and permanent injunctive relief, to an accounting of Strainge Entertainment's profits from its infringing activities.

**COUNT V – UNFAIR COMPETITION**
**UNDER MISSOURI COMMON LAW**

94.     Strange Music realleges and incorporates by reference each of the allegations in the preceding paragraphs as if fully set forth herein.

95.     The STRANGE Marks have acquired secondary meaning or significance that identifies Strange Music.

96.     As described herein, Strainge Entertainment has unfairly used the STRANGE Marks or simulations of those marks to the prejudice of Strange Music's interests.

97.     The natural and probable result of Strainge Entertainment's acts is deception of consumers and such acts are calculated to deceive the ordinary buyer making his purchases under the ordinary conditions which prevail in the music industry.

98.     Strainge Entertainment's conduct constitutes unfair competition under the common law of Missouri by a deliberate course of conduct, all without authorization, license, privilege, or justification.

99.     Strange Music will suffer and is suffering irreparable harm from Strainge Entertaiment's unfair competition.  Strange Music has no remedy at law to alleviate the likely market harms it has, and continues to, suffer as a result of Strainge Entertainment's unfair competition, such as the loss of business reputation, customers, market position, confusion of potential customers, and goodwill.

100.    Strange Music is entitled to an injunction against Strainge Entertainment's continuing unfair competition.  Unless enjoined, Strainge Entertainment will continue its unfairly competitive practices.

## PRAYER FOR RELIEF

WHEREFORE, Strange Music prays that the Court enter judgment in its favor and against Strainge Entertainment as follows:

A.    A preliminary and permanent injunction that Strainge Entertainment, its officers, agents, servants, employees, and attorneys, and all those persons or entities in active concert or participation with any of them who receive actual notice of the injunctive order be enjoined from (1) selling, offering for sale, advertising, promoting, distributing, marketing, or exploiting in any other way the STRAINGE Marks or any other mark confusingly similar to the STRANGE Marks in connection with the music industry or related goods or services; and (2) committing any other act calculated or likely to cause the public to believe that Strange Music and Strainge Entertainment are in any manner connected, affiliated, or associated with one another or otherwise competing unfairly with Strange Music;

B.    Pursuant to 15 U.S.C. § 1116(a), that Strainge Entertainment be directed to file with the Court and served on Strange Music, within thirty (30) days after entry of final judgment, a report in writing and under oath setting forth in detail the manner and form by which it has complied with the provisions set forth in the preceding paragraph;

C.    That Strainge Entertainment be ordered to compensate Strange Music for the cost of corrective advertising and other corrective measures reasonably calculated to attempt to mitigate the confusion cause by Strainge Entertainment's infringing and unfair actions;

D.      Pursuant to 15 U.S.C. § 1118, that Strainge Entertainment destroy all labels, signs, prints, packages, wrappers, receptacles, and advertisements that bear the STRAINGE Marks, and all means of making the same;

E.      Pursuant to 15 U.S.C. § 1117(a), that Strainge Entertainment be directed to account to Strange Music for all gains, profits, and advantages derived from Strainge Entertainment's infringing and unfair actions;

F.      Pursuant to 15 U.S.C. § 1117(a), that Strange Music recover from Strainge Entertainment its profits and any damages sustained by Strange Music by reason of Strainge Entertainment's infringing and unfair activities, trebled as allowed by law, together with interest on such amount and the costs of this action;

G.      Pursuant to 15 U.S.C. § 1117(a), that Strange Music recover its attorneys' fees and costs of this action from Strainge Entertainment;

H.      Actual damages suffered by Strange Music as a result of Strainge Entertainment's infringing and unfair conduct, in an amount to be proven at trial, as well as pre- and post-judgment interest as authorized by law; and

I.      For such other and further relief as the Court may deem just, proper, and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Strange Music demands a trial by jury on all claims and issues so triable.

Dated this 3rd day of October, 2017.       Respectfully submitted,

*/s/ Angel D. Mitchell*

B. Trent Webb (MO Bar 40778)
Angel D. Mitchell (MO Bar 52309)
**SHOOK, HARDY & BACON, LLP**
2555 Grand Blvd.
Kansas City, Missouri 64108
Phone: (816) 474-6550
Facsimile: (816) 421-5547

*Attorneys for Plaintiff Strange Music, Inc.*